## BANK OF THE METROPOLIS *v.* WEBER, Collector.

*(Circuit Court, S. D. New York. November 27, 1889.)*

1. BANKS AND BANKING—DEPOSITS—TAXATION—CHECKS AND DRAFTS OF CITY BANKS.
   Rev. St. U. S. § 3408, provides that state banks shall pay a tax of one twenty-fourth of one per cent. per month on the average deposits of money subject to payment by check or draft, or represented by certificates of deposit or otherwise, whether payable on demand or at some future day. Plaintiff, as such bank, received for deposit checks and drafts on other city banks, which were sent by it to another bank to be put through the clearing-house, necessitating the keeping of a large balance in such other bank to meet any balances that might be due from plaintiff to such bank on account of those clearances. *Held*, that the checks and drafts upon other city banks constituted a part of plaintiff's deposits subject to payment on check or draft, and should be included in determining the average daily deposits for the purpose of taxation.

2. SAME—CHECKS AND DRAFTS OF COUNTRY BANKS.
   But where a portion of plaintiff's deposits consisted of checks of country banks, which were not considered as subject to payment on check or draft until they had been sent to the respective country banks against whom they were drawn, and returned as good, such deposits should not be included in the average daily deposits until such return had been made.

At Law.

This is an action brought by the Bank of the Metropolis against Max Weber, collector of internal revenue, to recover $4,361.90, being the aggregate of certain internal revenue taxes assessed upon the bank for a tax upon the average amount of monthly deposits during the 18 months ending November 30, 1882. The plaintiff is a state bank, and the tax was levied under section 3408 of the Revised Statutes, which provides that such banks shall pay "a tax of one twenty-fourth of one per centum each month upon the average amount of the deposits of money subject to payment by check or draft, or represented by certificates of deposit or otherwise, whether payable on demand or at some future day." The amounts as to which plaintiff claims to have been illegally assessed are so much of the tax as was paid on deposits of checks of so-called "country banks," banks located elsewhere than in New York city, and so much of the tax as was paid on checks and drafts upon city banks, which, having been received by the plaintiff, were by it sent to the Union National Bank, to be put through the clearing-house. The Bank of the Metropolis was not a member of the clearing-house during this period; and it made its clearances of checks on other city banks, and checks on it deposited in other city banks, through the Union Bank, which was a member of the clearing-house. It was therefore necessary for it to keep with the Union Bank a large balance to meet any balances which might be from day to day due to the Union Bank from the plaintiff to make its clearances. As to the country checks, it appeared in evidence that there was an understanding between the plaintiff and its depositors that they should not draw against any country checks deposited by them until they had been sent out of town and returned as good. The other material facts appear in the opinion. The testimony being closed, each side moved for the direction of a verdict.

*Joseph H. Choate* and *Thos. T. Sherman*, for plaintiff.

*Edward Mitchell*, U. S. Atty., and *Abram J. Rose*, Asst. U. S. Atty., for defendant.

LACOMBE, J., (*orally.*) In view of the uncontradicted testimony in this case as to the arrangement between the bank and its customers, and of the decision of Judge BROWN, (*U. S.* v. *Nassau Bank*,[1]) I see no other way than to hold that these country checks were not deposits of money, subject to payment by check or draft, until the time that they ripened by collection into something other and different from what they were when deposited. I am still unable to reach the same conclusion as Mr. Choate, touching the sufficiency of the proof, but, in view of the fact that that is something which should be determined on a close inspection of the figures and proofs, am satisfied that the proper disposition to make of this branch of the case is to direct a verdict in favor of the plaintiff for the amount it claims, with interest. Thereafter, when the testimony is written out, and all the exhibits are before the court, examination may

[1] See note at end of opinion.

be made, upon a motion for a new trial, to see if the error which I think exists in the plaintiff's calculations does in fact exist, or if I have misconceived entirely what the testimony is upon that branch of the case.

With regard, however, to the other part of the case, to-wit, the claim for deduction on account of average balances held by the Union Bank, I must direct a verdict for the defendant. These average balances, as I understand them, are themselves made up from checks and drafts upon city banks deposited with the plaintiff by its customers. As to these, there was an arrangement between the banks, by which they were sent to the Union Bank to be cleared, and it may be that as the result of such arrangement the same amount of money has paid twice as a deposit; but it has so paid because it has lived twice as a deposit, once in each bank. It certainly was a deposit in the Bank of the Metropolis while in the shape of checks deposited by its customers, and was retained by it until the morning when it was sent down to the Union Bank. If, after that, it was so treated by the Union Bank as to become a deposit there, that fact is immaterial. Verdict directed accordingly.

---

### ON MOTION FOR NEW TRIAL.

#### (February 5, 1890.)

LACOMBE, J. The views expressed upon the trial as to the non-taxable character of country checks during transit, and as to the taxable character of the deposits sent to the Union Bank for clearance, are unchanged. Upon the reserved point, a careful examination of the various exhibits, and of the testimony in the case, has led to the following conclusions: The claim of the plaintiff is that it should have been required to return only the average net deposits, after deducting the average amount of country checks outstanding; in other words, that the returns it made should have been similar to those it did make prior to 1881. It concedes, however, that at some time the country checks should pay. What is to be ascertained, then, is whether the country checks would escape altogether, or to a considerable extent, if plaintiff's method of making returns were adopted. To do this, we may first take up the inquiry independent of the circumstance that the plaintiff has in fact paid, and now seeks to recover back. Assuming that for the months in question plaintiff is preparing its returns, is the method it asks to adopt the correct one? Inasmuch as the question concerns averages, it may be assumed that the amount of each item for each day is the average amount. So, too, it may be assumed that the time required to realize on each country check is the average time for all, and any particular time may be assumed, as, for instance, 10 days. If $20,000 of country checks are deposited each day, and 10 days are allowed for their transit, the amount of them outstanding each day will be $200,000,—a sum not, of course, composed entirely of the same checks for two successive days. We may then construct the following table:

| DAY OF THE MONTH. | A. GROSS DEPOSITS. (Aggregation of deposits as found at 3 P. M. day before.) | B. EXCHANGES. (Customers' checks which come up from clearing-house.) | C. NET DEPOSITS. [A–B] | D. COUNTRY CHECKS OUTSTANDING. | E. [C–D] (Deposits to be returned for tax, as plaintiff claims.) |
|---|---|---|---|---|---|
| 1 | $  2,500,000 | $    500,000 | $  2,000,000 | $    200,000 | $  1,800,000 |
| 2 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 3 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 4 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 5 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 6 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 7 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 8 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 9 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 10 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 11 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 12 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 13 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 14 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 15 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 16 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 17 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 18 | 2,500.000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 19 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 20 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 21 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 22 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 23 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 24 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 25 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 26 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| 27 | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |
| Divide by 27. | $67,500,000 | $13,500,000 | $ 54,000,000 | $5,400,000 | $48,600,000 |
| Average per mo. | 2,500,000 | 500,000 | 2,000,000 | 200,000 | 1,800,000 |

In the margin appears the business day of the month. In the first column, A, appears the gross total of deposits for each day, which is the aggregation of all depositors' balances as they stood at 3 P. M. the day before. In the second column, B, appear the exchanges. This is the aggregate of all checks drawn by depositors against their balances, and presented to the bank from the clearing-house, as the evidence shows, about noon. The third column, C, shows the net deposits for each day; that is, the amount to which the deposits left over at 3 P. M. of the day before are reduced by the payments of the checks drawn against them, and presented through the clearing-house on that day. Of course, the country checks are included in both columns, A and C. The next column, D, shows the total of country checks outstanding each day. It includes the $20,000 just received, and the $180,000 received on the 9 preceding days, and not yet returned, but does not include the $20,000, which, having finished its 10-day transit, is returned in cash by the country correspondent. The amount of D, plaintiff claims, should be deducted each day from the net deposits, C, and thus its return for

tax should be as shown in column E. Let us see the result of such a method of making returns, remembering that the plaintiff only contends that the country check should not pay while outstanding. It concedes that, when realized on, it becomes a true deposit, which should enter as a factor into the process by which the monthly average of taxable deposits is ascertained. The $20,000 of country checks deposited on the first day appears in columns A and C, but being included in the amount outstanding on that day, column D, and thus deducted, it does not on that day get into the column E, returned for tax. The $20,000 of country checks deposited on the second day shares the same fate. It does not figure in the return for tax on the second day, the first day of its 10-days transit. The same, of course, is true of each separate $20,000 deposited each business day. Returning now to the first $20,000: For 9 successive days after the first, it is still outstanding,—is included in column D,—and therefore does not figure in column E, the return for tax. At last, its 10-days transit being completed, this $20,000 of country checks reappears in the bank, found to be good and thus no longer a deferred deposit not to be drawn against, but a true deposit subject to draft, and a proper factor of the taxable average. Where does it appear in the account? It is found in column A. It was put there the eleventh day before; and, as the bank rules forbade the customer from drawing it out, it remained in that column during the transit period, and is still there at 3 P. M. of the tenth day, which is the time as of which column A is made up. It is not found in column D. During each day of its 10-days transit it was there, but now, being returned, it is no longer outstanding; therefore it is not to be deducted as a country check from the deposits. If the return for tax were the difference between columns A and D, the country checks would be found among the returns of the eleventh day. But another deduction has been made. Column A (in which, as we have seen, on the eleventh day our first $20,000 of country checks still appears) is reduced by the exchanges, B. If none of those exchanges were drafts against this particular $20,000, it would still figure in column C, and therefore in column E, not having been taken out of A, either, as an exchange or as an outstanding country check. If among those exchanges were drafts covering the whole of this $20,000, it would not appear in column E on that day, because it is taken out of A when B is deducted; nor on any prior-day, because taken out of A when D is deducted. It would thus escape entirely. It would at no time enter as a factor into the calculation by which the average of monthly deposits is determined. Unless it is shown that the $20,000 does not appear in the exchanges of that morning, therefore, this method of making the return is defective and illusory. The probabilities are that the depositor has drawn promptly against his deferred deposit, and that to a considerable extent the country checks leave the deposit column, A, as exchanges (B) before they get a lodgment in it by being marked off from their proper column (D.) This is an uncertainty which must be cleared up before the method of making returns for which the plaintiff contends can be accepted. Of course that burden rests with the party who holds the affirmative.

Let us now see to what extent, if at all, the situation is changed by the fact that in the present case the plaintiff has paid all the taxes demanded of it, and is suing to recover back an excess unlawfully exacted. The plaintiff insists that from A there shall be deducted both B and D. This is precisely the method of determining the amount of E, already discussed. In other words, what the plaintiff asks for here is a reformation of its original returns, and an adjustment of accounts with the government upon the basis of such reformed return. When the rebate it asks for is allowed, the tax which it has paid will be reduced to precisely the sum which would be found payable under the method of calculation shown in the table *supra;* and, as shown before, the probability of the government's thus losing a tax on some considerable amount of taxable deposits is so great as to be practically a certainty. So long, therefore, as plaintiff does not by proof eliminate such probability of loss, by showing that the proceeds of the country checks do not get out of the column of deposits in the manner suggested, it is not entitled to recover the full amount asked for.

Under the ruling already made, however, as to the *status* of a country check deposited with the bank but not to be drawn against while outstanding, the government has undoubtedly taken too much. It has taken a tax upon the average of column C, which includes all the country checks for the whole period from their deposit till they are drawn out. To demonstrate this, let us assume that the proceeds of country checks are drawn out promptly when they become available, and then see what has happened to the $20,000 deposited on the first day. It did not become a tax-paying deposit when made, but did on that day figure in column A. Nor was it such while in transit, though it still remained in that column. It did become a tax-paying deposit on the day of its return. If it was then drawn out, it should figure as such only for one day. By the government's method, it has so figured for 10 days. By the true method, it should enter once as an item of the monthly aggregate, which is to be divided by 27 to get the daily average for the month. By the government's method, it enters into such aggregate 10 times. By the true method, it should count as $20,000. By the government method, it counts as $200,000. This is manifestly unjust. Can it be corrected? If so, in what way other than that suggested by the plaintiff, which, as we have seen, is open to a fatal error? The answer to this may be found in a study of the table. If $20,000 of country checks is deposited each day, and, being suspended for 10 days, becomes then subject to draft, and is thereupon drawn out, the total so deposited for the month will be $540,000. What is carried over from the month before, and what runs into the month after, keeps each day's amount equal for any current month. This sum, then, ($540,000,) divided by 27, will be the average for the month. But in the table the average of outstanding country checks for the month appears (column D) to be $5,400,000 divided by 27. Why? Because each $20,000 is counted 10 times instead of once. In the final aggregate, then, of net deposits, (C, $54,000,000,) that aggregate which, when divided by 27,

should give the taxable deposits, there is included $5,400,000 as country checks, when in fact the total of country checks subject to draft was only $540,000. What, then, shall be deducted from the $54,000,000? The whole $5,400,000? No; only the difference between $5,400,000 and $540,000, or, $5,400,000 — $540,000 = $4,860,000. And $540,000 is one-tenth of $5,400,000.

All calculations so far have been made on the supposition that it takes 10 days for the transit of a country check. Suppose, now, that it only takes 5 days. The total country checks amount, as before, to $540,000. As it takes only 5 days for transit, the balance outstanding on any single day is $20,000 × 5 = $100,000. The aggregation of these balances will be $2,700,000; each $20,000 being counted five times instead of once, as it should be. The $54,000,000 should in that case be reduced, not by $2,700,000, but by $2,700,000 — $540,000, which is $2,160,000. And $540,000 is one-fifth of $2,700,000.

Again, suppose it takes but three days for the transit of a country check. The total deposits of such checks are, as before, $540,000. The balance outstanding each day, $20,000 × 3 = $60,000. The aggregate of such balances will be $60,000 × 27 = $1,620,000; each $20,000 being counted three times instead of once. The $54,000,000 of net deposits should then be reduced, not by $1,620,000, but by $1,620,000 — $540,000, which is $1,080,000. And $540,000 is one-third of $1,620,000. Of course, to turn these reductions into averages, they should be divided in each case by 27. Thus:

$$\$4,860,000 \div 27 = \$180,000$$
$$2,160,000 \div 27 = 80,000$$
$$1,080,000 \div 27 = 40,000$$

We are now prepared to state the rule, which is this: Ascertain the average number of days required for the transit of country checks. Deduct from the average amount of country checks outstanding a sum which bears the same proportion to such average amount as one day does to the average number of days of transit. The remainder will be the average amount of country checks upon which the government has improperly levied the tax, and for 24 per cent. thereof, with interest, plaintiff is entitled to recover. The present judgment is excessive, and should be set aside. As there is not sufficient evidence in the case to determine the correct amount, there being no proof of the average number of days required in transit, a new trial is ordered.

It is urged by the defendant that the country checks should be treated as deposits from the date of their receipt by the bank, because they were at once charged to the country correspondents to whom the bank forwarded them for collection. These country correspondents kept deposits with the plaintiff bank, subject to draft, and therefore, of course, taxable. These deposits, it is claimed, were reduced by charging against them the country checks which were sent to the correspondents. Whether these country checks were so entered on the bank-books as to counter-balance an equal amount of undisputed taxable deposits is not entirely clear upon the proof, and this point may therefore be reserved

until the testimony on the new trial may remove all doubt as to the facts.

## NOTE BY THE EDITOR.

The case of U. S. v. Nassau Bank, referred to in opinion, was decided by Judge BROWN in the district court for the southern district of New York, February 16, 1883, but has never been reported. The opinion was as follows:

"BROWN, J.   *This action is brought under section 3408 of the United States Revised Statutes to recover a tax upon* 'an average amount of the deposits of money subject to payment by check or draft, or represented by certificates of deposit or otherwise, whether payable on demand or at some future day.' In order to constitute such a deposit as this section describes, it must be a deposit of money subject to payment by a check or draft, either immediately or at some future day. That requisition is not met until the bank becomes responsible at all events for the deposit. So long as there is a contingency about it,—so long as the bank has not assumed any absolute obligation to pay,—the deposit does not come within this description. That makes this case turn upon the nature of the dealings between the depositor and the bank. Where deposits are made in a bank, and entered in the customer's deposit book, in the usual way that deposits of money are entered, that is *prima facie* evidence of a receipt of those deposits by the bank as money, payable at once on draft, and therefore, *prima facie,* within this section; and, if the evidence had stopped there, I should clearly have felt bound to direct a verdict for the plaintiff. But entry in the pass-book is only one circumstance in evidence as to what the actual transaction between the parties was, and what the intention and agreement between the parties were. In the case of Ex parte Pease, 1 Rose, 232, to which reference is made in the opinion of Judge DANIELS, in Metropolitan Bank v. Loyd, 25 Hun, 101, the lord chancellor says, expressly, that the question is one to be determined from all the evidence between the parties to the transaction as to what the intention and the agreement were. The entry is one piece of evidence, but only one; and in this case we have the testimony of the cashier as to the usage and dealing and understanding between those parties. As there has been no evidence to controvert that, and as I find nothing in the different parts of this testimony inconsistent with each other, we must accept what he says; and he says, unequivocally, that the deposits of these country checks, although entered along with other deposits of cash, and in a deposit book, were not subject to draft; that customers were never allowed to draw on them till collected; that the bank is not responsible for them, and that they are entered, along with other items, in the depositor's book, for convenience in book-keeping, and to avoid the great inconvenience and great additional burden if any other mode of entry were undertaken to be adopted with such out of town checks. There is no evidence to contradict that; and therefore, upon his testimony, the case stands upon the fact that these country checks, although entered in the deposit book, are not subject to draft, and that the depositor has no right to draw upon them till paid, and that if he did so the bank could refuse payment, and defeat any action brought to recover upon them until such country checks were returned collected. On his testimony, that is the inevitable and necessary legal conclusion.

"In the Case of The Metropolitan Bank, 25 Hun, 101, recently affirmed in the court of appeals, (90 N. Y. 530,) the facts proved were the opposite. The referee before whom that case was first tried, found as a fact that the out-of-town check was deposited as money, and received as money by the bank. The court of appeals comment upon and rely upon that fact; and in the court below, at general term, Judge DANIELS states expressly that the facts found show that the transaction was ' equivalent to a discount by the bank, and the deposit of the proceeds to the customer's credit by the bank in his account.' If the bank discounts commercial paper, it is liable to pay the amount at once. The court of appeals refers to this obligation, and finds that upon the facts proved in the Case of The Metropolitan Bank, there was an absolute obligation to pay the depositor at once. ' While the depositor did not draw checks or drafts against it, but the bank was largely his debtor, he still had the right to do it, if he had been so disposed.' Neither the court of appeals, nor the court below at general term, assumes to overrule any of the quite numerous analogous cases that have been decided in this country and in England, especially in cases in bankruptcy. The general term does not refer to the case of Scott v. Bank, 23 N. Y. 289. The head-note is in this language: ' The property in notes or bills transmitted to a banker by his customer, to be credited the latter, vests in the banker only when he has become absolutely responsible for the amount to the depositor.' The same view was taken in the famous case of Thompson v. Giles, 2 Barn. & C. 427. Although there, by usage, there was a certain limited right of the depositor to draw upon bills deposited, still the bills were not, upon the facts proved, considered to be the property of the bank, the advances being simply in the nature of a credit upon the securities; and the court there said it would be unreasonable to hold that the bank was absolutely liable for bills deposited, and that there was no such relation between the parties. There are many other cases on the subject.

"I think the turning point in the whole case is whether the transaction in point of fact, taking all the circumstances together, shows that when this deposit was made the

bank was under any obligation immediately to honor drafts or checks drawn against it: and the evidence is that the understanding between the customer and the bank was that no drafts or checks could be drawn upon a deposit until collection. This evidence leaves no doubt that this was the known usage and custom of the bank, and that therefore this deposit was not in fact subject to draft or payment until collection. The evidence, however, is that the amounts collected were duly entered in the returns to the United States officers as of that date of collection, and that payment of the tax was made upon all such collections. Upon that testimony, uncontroverted, it seems to me that the bank has fulfilled its whole duty to the government, and with perfect accuracy as to time. Under this evidence, the only thing on which the government could have any claim would be upon those country checks or drafts which were never collected, and which, therefore, did not get into the ultimate returns. But as to those, upon the evidence, it seems to me perfectly plain that the bank never came under any obligation to honor a draft based upon such uncollected deposits; and such deposits, therefore, do not come within the scope of this statute. For these reasons I direct a verdict for the defendant. "